Filed 2/4/14  In re V.L. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re V.L., et al., Persons Coming Under the Juvenile Court Law. | B249884 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. PAOLA G., Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK83501) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Donna Levin, Juvenile Court Referee.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

_____

Paola G.'s parental rights with respect to three of her children were terminated pursuant to section 366.26 of the Welfare and Institutions Code,[1] and a fourth child became a dependent child of the court. Paola G. claims on appeal that her section 388 petition seeking return of the children to her custody should have been granted; that the juvenile court erred in failing to apply the parent-child relationship exception to the statutory preference for adoption; and that the court erred when it found the youngest child subject to the jurisdiction of the juvenile court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     V.L., Aaden L., and Allyson L.

Three year-old V.L. and one year-old Aaden L. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in July 2010 when reports were made of domestic violence by their father, Christopher L., against them and against their mother, Paola G. Paola G. told DCFS about violence in the home and also admitted that she periodically used methamphetamine. She underwent drug testing, and the results revealed levels of methamphetamine indicative of a chronic heavy user who had probably used methamphetamine the day she tested.

DCFS detained the children and filed a petition under section 300, subdivisions (a) and (b) alleging that the children fell within the jurisdiction of the juvenile court due to domestic violence, Paola G.'s drug use, and Christopher L.'s failure to protect them from their mother's drug use.

In September 2010 Paola G. pleaded no contest to the dependency petition. The court dismissed the section 300, subdivision (a) and (b) allegations concerning domestic violence and declared the children dependents of the juvenile court under section 300, subdivision (b) based on the sustained allegation concerning Paola G.'s drug use and Christopher L.'s failure to protect the children from the effects of her substance abuse.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The court further found by clear and convincing evidence that substantial danger existed to the physical health of the children and/or that the children were suffering severe emotional damage, and that there was no reasonable means to protect them without removal. Paola G. was ordered to undergo drug rehabilitation.

Paola G. began and then abandoned multiple drug treatment programs. She left the first program in September 2010 because she did not like being away from her children and Christopher L. She participated sporadically in the second program from September to November 2010; she was reportedly "unable to embrace the program and [wa]s unable to follow directions [from] counselors."

Paola G. did not appear for her scheduled drug tests from October 22, 2010, through December 7, 2010. She relapsed in November 2010 and she blamed her relapse upon the stress of the dependency case. As of March 2011, Paola G. was on her third drug treatment program since the children were detained. She had begun having visits with the children, and she was also pregnant.

V.L. had been in regular play therapy designed to address symptoms of post-traumatic stress disorder, to assist her with separation from her mother, and to assist her in reducing trauma-related anxiety. V.L. was described as proactive and highly compliant; she was doing well in therapy and at home, with no behavioral concerns. Aaden L. had been throwing daily tantrums that were so severe that he would throw himself on the floor and try to bang his head; DCFS was working to coordinate therapeutic services for him. The severity of the tantrums had been decreasing in recent weeks.

At the March 2011 review hearing, the court found that the children could not be returned to their parents without a substantial risk of detriment to their physical and/or emotional well-being. The court continued reunification services for both parents.

Allyson L. was born in April 2011. Initially she was with her parents, but in August 2011 she was detained and a dependency petition filed after Paola G. tested positive for methamphetamine and amphetamine. Paola G. had been discharged from a fourth drug treatment program in June due to nonattendance; she had enrolled in a fifth

3

program in July, but she had missed more than half of the days since she enrolled. She also missed many scheduled drug tests. The juvenile court ordered that Paola's visitation with her three children be monitored.

As of September 2011, DCFS summarized Paola G.'s situation: "Since the inception of the case the mother has voluntar[il]y dropped out of three drug treatment programs for various reasons and she was discharged from one due to non-compliance and one due to being placed on bed rest during her pregnancy. Additionally, the mother has not been testing consistently during that period and had missed 10 drug tests and one test came back positive for Amphetamines . . . and Methamphetamine . . . . The mother admitted that during this last six month period of supervision she relapsed on three occasions which le[]d to her four month old child Allyson L[.] being detained from the mother's care. The mother has failed to demonstrate that she [is] ser[i]ous about gaining the skills needed for long term sobriety."

Paola G. pleaded no contest to this dependency petition as well. On September 16, 2011, the court sustained an allegation in the dependency petition relating to Paola G.'s conduct and declared Allyson L. a dependent child under section 300, subdivision (b).

Between September and October 2011, Paola G. stopped attending various portions of her outpatient treatment program, causing the program to report that she did not appear to be committed to the treatment program or to doing the work necessary to attain skills to lead a drug-free life. She tested positive in October 2011 for amphetamine and methamphetamine. DCFS recommended the termination of reunification services and the pursuit of adoption as a permanent plan for the children.

On October 21, 2011, the juvenile court terminated reunification services for both parents with respect to the older two children. Paola G. was denied reunification services with Allyson L., and Christopher L. was given six months of reunification services. Paola G. was granted monthly monitored one-hour visits with the children.

4

Paola G. entered an inpatient drug treatment program in October 2011. In February 2012, Paola G. left this program when she was asked to take an unscheduled drug test after program staff caught residents bringing drugs into the facility.

Paola G. visited with her children almost monthly, attending five visits in six months between October 2011 and March 2012. The visits were reported to go well, Paola G. was appropriate, and the three children "enjoyed themselves" during visits.

Christopher L. failed to reunify with Allyson L., and the juvenile court terminated his reunification services in June 2012. The children were placed together in the home of prospective adoptive parents in July and August 2012.

As of October 2012, Paola G. had begun to fail to appear for the visits she scheduled. The children were no longer informed of visits in advance so that they would not be disappointed if their mother did not appear. She had not visited the children since August 2012.

On March 15, 2013, Paola G. filed a section 388 petition with respect to V.L., Aaden L., and Allyson L. She requested that the children be placed in her care with family maintenance services; or, in the alternative, family reunification services with frequent liberal visitation. According to Paola G., she was now "clean and sober." She advised the court, "I am enrolled at El Pro[y]ecto del Barrio substance abuse rehabilitation program that offers 12 step meetings, parenting, anger management, health education, domestic violence, life skills, peer support, daily reflections and self esteem classes. I also submit to random drug tests yielding all negative results and attend individual counseling." The court held a hearing that day and denied the petition on the ground that the proposed change of order did not promote the best interests of the children. The same day, the juvenile court terminated Paola G.'s and Christopher L.'s parental rights to V.L., Aaden L., and Allyson L. Paola G. appeals the denial of her

5

section 388 petition and the termination of her parental rights with respect to V.L., Aaden L., and Allyson L.[2]

## II.    Isabella G.

In February 2013, Paola G. gave birth to a fourth child, Isabella G. Mother and baby were discharged from the hospital on February 5, and on February 6, DCFS conducted an unannounced home visit. Paola G. told DCFS that she had last used methamphetamine in February 2012. She admitted that she did not complete her most recent drug program and blamed her February 2012 relapse on Christopher L. She told DCFS that she had stopped spending time with drug-using friends and that she wanted to start a new life.

Isabella G. did not test positive for any drugs at birth. Paola G. showed DCFS drug test results from November 26, 2012, January 8, 2013, and January 17, 2013, all of which were negative for drugs and alcohol. She also reported that she had been drug tested in the hospital and that those tests were negative as well. Her prenatal progress report, however, included an entry from September 2012 in which Paola G. refused random urine testing.

Paola G. was willing to submit to an on-demand drug test and to re-enroll in a drug treatment program. Her February 11, 2013 test was negative. She re-enrolled in a drug treatment program on February 14, 2013. DCFS reported that Paola G. was "in agreement with having Court intervention."

The DCFS social worker who had worked with Paola G. and her three older children reported, "Paola can maintain her sobriety while she is pregnant, however, once she gives birth, she has not been able to stay sober. She is a program jumper and has not been able to complete any of the programs that she enrolls in." Another social worker with experience with the family observed, "I know she tends to relapse when she is not

---

[2]    We previously affirmed the order terminating Christopher L.'s parental rights with respect to V.L., Aaden L., and Allyson L. (*In re V.L.* (Nov. 5, 2013, B248361) [nonpub.opn.].)

6

pregnant anymore and it is like a ticking time bomb. Her history is so long. . . . She says that what is different now [is] that she has support systems and she has contact with the other children's father. She says they are not together, but they visit together with the other kids. I don't know if she understands . . . they both never really resolved their domestic violence issues. They are in contact with each other regularly . . . his name is on the lease and that's evidence that they are still having a relationship . . . The case needs to be monitored and she needs to show that she is willing to live a sober" life.

Paola G. told DCFS that she began using methamphetamine when she was 16 years old. She claimed that she had not been using drugs when she had V.L., but that she resumed using drugs when V.L. was three years old because she had problems with her mother and Christopher L. Paola G. said that she stopped using drugs when V.L. was approximately four and one-half years old, but that she resumed when Allyson L. was four months old. That time, she began using drugs because she was "stressed out and it would help me with the kids and getting up early."

DCFS filed a dependency petition alleging that Isabella G. came within the jurisdiction of the juvenile court under section 300, subdivision (b) due to her mother's history of illicit drug use. On February 25, 2013, the court concluded that services were available to prevent detention and ordered Isabella G. released to Paola G.

The drug treatment program reported to DCFS in March 2013 that Paola G. was doing well in the program thus far. She had only been in the program for approximately one month, but she was attending the required sessions and actively participating. The program reported that Paola G. had two negative drug tests and that she was working hard on her recovery: "[S]he is embracing the program and has really strong faith."

At the contested jurisdictional hearing, Paola G. maintained that she was clean and sober and that there was no risk to Isabella G. Counsel for DCFS and counsel for Isabella G. asked the court to take jurisdiction over Isabella G. because of the risk presented by Paola G.'s extensive history of drug use and its interference with her parenting. The court sustained the section 300, subdivision (b) allegation in the petition, commenting, "I did not remove the child from the mother because at this point I want to give her a

chance. She recently re-enrolled in programs, and I'm hoping that that will take. Now, it doesn't mean everything is all better now, okay, we could just, this child is fine. There's no risk. There's a long history here that is a risk, mother's past behavior. It's a risk that she's going to relapse again in the future. I hope that doesn't happen, but that's what a risk is, there's a chance that that could happen, and I hope that mother is serious now about changing her life, about staying clean[,] about not giving into stressful situations and getting on drugs again. So, I think it's very clear here that because of what's happened in the other children's case, the mother did not ameliorate the situation and only had a stint. As I said, only in February this child was born. She did enroll in a program. I'm going to give the mother a chance. I hope it's successful, but I am going just to sustain the petition as pled so the court find[s by] a preponderance of the evidence that [allegation] B(1) is true as pled and that the child, Isabella, is a person described by Welfare and Institutions Code section 300[, subdivision] (b)." Paola G. appeals.

## DISCUSSION

### I. Section 388

Section 388 is a general provision permitting the court, "upon grounds of change of circumstance or new evidence . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a).) The statute permits the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists; and (2) the proposed change would promote the best interests of the child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) A parent seeking an order for reunification services after they have been terminated has the burden of proving by a preponderance of the evidence that the benefit to the child of resuming reunification efforts outweighs the benefit the child would derive from the stability of the permanent placement. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464-465.) We review the court's ruling for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

8

We find no abuse of discretion here. While all of Paola G.'s attempts to address her substance abuse problems deserve commendation, at the time of the section 388 petition hearing in March 2013 she had not demonstrated a change of circumstances or that her requested relief was in the best interest of the children. V.L. and Aaden L. had been in the dependency system since 2010, with Allyson L. being removed from her parents when she was only a few months old, and over the course of the proceedings Paola G. repeatedly started drug treatment programs, then left them without completing them; and she relapsed when her life became stressful. Paola G. had only been in her current program for approximately one month. She was doing well and appeared to be committed to the program, but she was also very new to it, and she had begun programs with promise many times in the past.

In contrast, the children were moving toward permanency and thriving. They had been placed with prospective adoptive parents for a number of months, and the placements were going well. DCFS reported, "All three children are growing and thriving under the care of Mr. and Mrs. G. Aaden is talking more and is much more outgoing than he was while in prior foster homes. His tantrums are no longer an issue, as they once were. V[.] reports that she loves her new mommy and daddy and does not ever want to leave. Allyson is obviously bonded with the caregivers. She is affectionate and goes to them for comfort."

While Paola G. did demonstrate that she was once again trying to address her substance abuse issues, at best, Paola G. had demonstrated that her circumstances were beginning to change, not that they had changed; and she had not shown that reunification services with her were in the best interest of her three older children. As the juvenile court noted, "I think that things are changing. I hope they are changing. I hope that mother gets to raise her current baby [Isabella], but as to the other three children, that's just it. It is changing, it is too little, too late. Mother just enrolled [in treatment] last February, and this is just not enough to grant the [section] 388 [petition]." The juvenile court did not abuse its discretion in denying the section 388 petition.

9

## II.    Parent-Child Exception

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child.  When there is no probability of reunification with a parent, adoption is the preferred permanent plan.  [Citation.]  To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the minor is likely to be adopted if parental rights are terminated.  (§ 366.26, subd. (c)(1).)  Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions (§ 366.26, subd. (c)(1)(A)-(B)), the juvenile court 'shall terminate parental rights.'  (§ 366.26, subd. (c)(1).)"  (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.)

Paola G. asserts that the parent-child relationship exception to termination of parental rights was applicable here.  We review the determination whether a beneficial parental relationship exists for substantial evidence and the conclusion as to whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) under the abuse of discretion standard.  (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.)

"Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' (§ 366.26, subd. (c)(1)(B)) because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).)  The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'  [Citations.]  No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.'  [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction,

10

companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

Here, although it did not make separate findings on the two prongs of the parent-child exception to termination of parental rights, the juvenile court concluded that the evidence before the court demonstrated that Paola G. did not have a beneficial parental relationship with the children. The court was correct. At times, Paola G. had visited the children regularly, but she had also failed to appear for scheduled visits to the point where the children were no longer informed of visits in advance to avoid disappointment if she did not appear. She went more than one month without seeing the children in 2012. Even when Paola G. was visiting as scheduled, her visits were monitored and they were monthly one-hour visits.

Paola G. testified that during visits, they ate, played, and talked. She did not help V.L. with schoolwork because the present foster parents "are not like that." V.L. and Aaden L. ran to her and embraced her at visits, and V.L. cried when visits ended, although Aaden L. did not. Paola G. told the court that V.L. and Aaden L. addressed her as their mother. Paola G. admitted that Allyson L. "doesn't really have the bond with me." Paola G. may have raised V.L. for her first three years, the children may have been excited to see her at visits, and she may have behaved appropriately at visits, but these facts do not rise to the level of acting in a parental role in the children's lives. Interacting with the children in an appropriate, loving manner and having "enjoyable" visits is not enough to establish that one occupies a parental role in the children's life. "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

11

Although the court's conclusion that Paola G. did not establish a beneficial relationship with the children was sufficient to end the inquiry, the juvenile court nonetheless considered whether the children would benefit from continuing their relationship with her and concluded that that it was in the best interest of the children to terminate parental rights. We have not identified any evidence in the record that termination of the parent-child relationship would have been detrimental to any of the children or that their relationships with their mother conferred benefits to them more significant than the permanency and stability offered by adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [exception applies only if the severance of the parent-child relationship would "deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed"].) We cannot say that the juvenile court abused its discretion when it concluded that the benefits to the children that would arise from adoption outweighed any detrimental impact that might come from severing their relationship with their mother.

### III.    Jurisdiction Over Isabella G.

Paola G. argues that the juvenile court had no jurisdiction over Isabella G. We review the juvenile court's jurisdiction and disposition findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*Ibid*.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V*. (1992) 5 Cal.App.4th 1201, 1212.)

Here, sufficient evidence supports the juvenile court's conclusion that there was a substantial risk that Isabella G. would suffer serious physical harm or injury as a result of

the failure or inability of Paola G. to adequately supervise or protect her. Although it is true, as Paola G. argues, that she was testing negative for drugs at the time of the jurisdictional hearing, the court also had evidence before it that Paola G. had struggled with substance abuse issues for many years and that she had a pattern of becoming sober for a new child, only to relapse when under stress when the child was young. She used drugs before her children were born; she relapsed when oldest child V.L. was young; she relapsed again when Allyson L. was young; and she continued to use drugs even after her three older children had been detained from her. She was unable to provide appropriate care and supervision to her children when she was using drugs. Paola G. had started many drug treatment programs, but she never completed any, even when ordered by the juvenile court to do so. While it is commendable that Paola G. enrolled in another drug treatment program in February 2013, approximately two months before the jurisdictional hearing, her long history of substance abuse and her pattern of relapsing once no longer pregnant nonetheless demonstrated a substantial risk to Isabella G.

Paola G. contends that there was insufficient evidence to support jurisdiction over Isabella G. because there was no evidence that Paola G. was using drugs; because DCFS did not "establish serious harm to the child"; and because there was "no nexus" between her prior drug use and any harm to Isabella G. We disagree. With respect to Paola G.'s first two arguments, although Paola G. was not using drugs in the months immediately preceding and following Isabella G.'s birth as demonstrated by a series of drug tests, and had not inflicted any injuries on the child, that does not mean that there was not a substantial risk to her. Section 300, subdivision (b) does not require that the child have suffered serious physical harm, only that there is a substantial risk that the child will suffer serious physical harm or illness as a result of the parent's conduct. The court need not wait until a child is seriously abused or injured to assume jurisdiction, but may also protect children at substantial risk of harm. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) As the Supreme Court has recently explained, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivision at issue here requires only a 'substantial risk' that the child will be abused or

13

neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at *risk of that harm*.' [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*Ibid*.) Given the nascent nature of her recovery, Paola G.'s longstanding history of methamphetamine use, her failure to complete treatment in the past, and her inability to provide regular care to her children when she relapsed, placed Isabella G. at substantial risk of serious physical harm.

As for the claimed absence of any nexus between Paola G.'s conduct and Isabella G., this case is not like the cases on which she relies, in which there was no evidence that the problems of the parents, whether drug use or mental illness, affected the minors. Here, when Paola G. was using methamphetamine, her drug use rendered her incapable of caring for and supervising her children. The court took jurisdiction of Isabella G. based on the risk known to exist to her due to Paola G.'s prior conduct: Paola G. had proven unable to provide regular care to her three older children due to her long-standing, unresolved history of drug abuse; she had not yet been able to complete a rehabilitation program; and she had also demonstrated a pattern of becoming sober when pregnant but relapsing thereafter. Paola G. may contend that the risk to Isabella G. was speculative, but these facts were sufficient to permit the court to conclude—even as it remained hopeful that Paola G. would break her patterns and successfully care for Isabella G.—that there was a substantial risk that Isabella G. would be seriously harmed by Paola G.'s inability to supervise or protect her. Substantial evidence supported the juvenile court's jurisdictional findings concerning Isabella G.

**DISPOSITION**

The judgment and orders are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

15